# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

### INDICTMENT FOR VIOLATING THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO), MAIL FRAUD, WIRE FRAUD, USE OF AN INTERSTATE FACILITY IN AID OF RACKETEERING, AND FORFEITURE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 10- 132-BAJ-DLD |
| | : | |
| versus | : | 18 U.S.C. § 1341 |
| | : | 18 U.S.C. § 1343 |
| DEREK A. LEWIS | : | 18 U.S.C. § 1346 |
| FREDERICK W. SMITH | : | 18 U.S.C. § 1952 |
| | : | 18 U.S.C. § 1962 |
| | : | 18 U.S.C. § 1963 |
| | : | 18 U.S.C. § 2 |

## THE GRAND JURY CHARGES:

At All Times Relevant to this Indictment:

1) **DEREK A. LEWIS** (hereinafter referred to as "**LEWIS**"), defendant herein, was the Mayor of the City of Port Allen, Louisiana ("the City"). As Mayor, he was the chief executive officer of the City government.

2) **FREDERICK W. SMITH** (hereinafter referred to as "**SMITH**"), defendant herein, was Chief of the City's Police Department. As Chief, he was responsible for overseeing the police department and the enforcement of criminal laws in the City.

3) Johnny L. Johnson, Sr. (hereinafter referred to as "Johnson") was a member of the City Council until January 2009. As a council member, he was responsible for, among other things, voting on contracts between the City and private vendors.


BAJ
DLD > 2

4)     Businesspeople A and B (hereinafter collectively referred to as "the Businesspeople") were affiliated with a company involved in the development of a conceptual product known as the "Cifer 5000." The Cifer 5000 was marketed as an automated waste container cleaning system using specially designed and equipped trucks to clean and sanitize commercial and residential waste containers. The Cifer 5000's potential customer pool consisted primarily of government entities, such as municipalities.

5)     Through the West Baton Rouge Parish Office of Homeland Security, the Port Allen Police Department had access to confidential law enforcement information through the Federal Bureau of Investigation's (FBI) National Crime Information Center (NCIC) computer database located in West Virginia. Such information included criminal history, the existence of warrants, the existence of protective orders, and various other law enforcement related information. When seeking information, the FBI required that the purpose of the information be identified, such as Criminal Justice Purpose.

6)     Through the West Baton Rouge Parish Office of Homeland Security, the Port Allen Police Department also had access to confidential law enforcement information through a computer network based in Arizona known as the National Law Enforcement telecommunications System (NLETS). Such information included driving history, motor vehicle records, and criminal history information. This system allowed local police departments to obtain such information from other states and jurisdictions.

## COUNT ONE

## VIOLATION OF THE RACKETEER INFLUENCED
## AND CORRUPT ORGANIZATIONS ACT (RICO)

7)      Paragraphs 1 through 6 of this Indictment are incorporated herein.

### The Enterprise

8)      At all times material to this Indictment, the City of Port Allen, Louisiana,

constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4)

(hereinafter "the enterprise").  This enterprise was engaged in, and its activities affected,

interstate commerce.

### Purpose of the Defendants

9)      The defendants improperly used the enterprise to enrich themselves through

bribery.

### Role of the Defendants

10)     The defendants obtained cash and other things of value worth approximately

$20,000 from the Businesspeople in exchange for using their official positions with the City of

Port Allen for the benefit of the Businesspeople in connection with transactions represented to be

worth over $5,000,000.

### Means and Methods of the Defendants

11)     Among the means and methods by which the defendants conducted and

participated in the conduct of the affairs of the enterprise were the following:

a.      **LEWIS** would obtain cash and other things of value from the

Businesspeople in exchange for using his position as Mayor to attempt to obtain millions

3

of dollars in federal funding for the Cifer 5000. Such official efforts included **LEWIS** signing and submitting a letter of support for a $3,000,000 to $4,000,000 grant request to the United States Environmental Protection Agency (EPA) (hereinafter referred to as "the EPA letter").

      b.      **LEWIS** would obtain cash and other things of value from the Businesspeople in exchange for using his position as Mayor to attempt to obtain private funding for the Cifer 5000. Such official efforts included **LEWIS** signing and submitting a false letter he believed would raise $2,000,000 to $3,000,000 from private investors of the Cifer 5000.

      c.      **LEWIS** would obtain cash and other things of value from the Businesspeople in exchange for using his position as Mayor to promote the Cifer 5000 to other public officials. Such official efforts included **LEWIS** signing and submitting a false letter he believed would be used to persuade other mayors to contract for the Cifer 5000.

      d.      **LEWIS** would obtain an agreement to share in the Cifer 5000 profits from Businessperson B in exchange for **LEWIS** agreeing to provide the Cifer 5000 with a contract with the City.

      e.      **LEWIS** and **SMITH** would obtain cash and other things of value from the Businesspeople in exchange for using **SMITH**'s position as Chief of Police to obtain confidential law enforcement information for the Businesspeople. To obtain such information, **SMITH** would falsely represent that **SMITH** was seeking the information for a criminal justice purpose.

4

f.    **SMITH** would obtain cash from Businessperson B in exchange for using his position as Chief of Police to write a letter to a Connecticut prosecutor seeking leniency for an individual he believed was facing drug charges (hereinafter referred to as "the leniency letter").

g.    **SMITH** would obtain cash from Businessperson B in exchange for using his position as Chief of Police to cause traffic tickets to be corruptly dismissed.

h.    **SMITH** would obtain cash from Businessperson B in exchange for using his position as Chief of Police to provide the Businesspeople with official Port Allen Police Department badges.

i.    **SMITH** would obtain cash from Businessperson B in exchange for agreeing to use his position as Chief of Police to commission the Businessperson as an official police officer with the Port Allen Police Department.

### The Racketeering Violation

12)    From at least in or about October 2008 until in or about June 2010, in the Middle District of Louisiana and elsewhere, the defendants **DEREK A. LEWIS** and **FREDERICK W. SMITH**, together with others known and unknown, being persons associated with the enterprise described above, an enterprise engaged in, and the activities of which affected, interstate commerce, unlawfully and knowingly conducted and participated, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, that is, through the commission of Racketeering Acts One through Twelve as set forth in paragraphs fourteen through twenty-four below.

## The Pattern of Racketeering Activity

13)    The pattern of racketeering activity as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisted of the following acts:

14)    <u>Racketeering Act One</u>:  Public Bribery

On or about October 10, 2008, in the Middle District of Louisiana, **LEWIS**, a public official, did solicit and agree to accept two tickets to a New Orleans Saints versus the Oakland Raiders football game worth approximately $345 from Businessperson B with the intent to influence his conduct in relation to his position, employment, and duty, that is, **LEWIS** agreed to accept the tickets in exchange for agreeing to use his official position to promote the Cifer 5000, in violation of Title 14, Louisiana Revised Statutes, Section 118.

15)    <u>Racketeering Act Two</u>:  Public Bribery

On or about November 18, 2008, in the Middle District of Louisiana, **LEWIS** and Johnson, public officials, did agree to accept a luxury suite at a Bayou Classic football game worth approximately $8,260 from the Businesspeople with the intent to influence their conduct in relation to their position, employment, and duty, that is, **LEWIS** and Johnson agreed to accept the suite in exchange for providing official letters stating that the City was committed to contracting with the Cifer 5000, which letters **LEWIS** believed would be used by Businessperson A to generate $2,000,000 to $3,000,000 in private funding for the Cifer 5000 (hereinafter referred to as the "investor letters"), in violation of Title 14, Louisiana Revised Statutes, Section 118.

16)     Racketeering Act Three: Public Bribery

On or about December 10, 2008, in the Middle District of Louisiana, **LEWIS**, a public

official, did solicit and agree to accept payment of $1,520 for a food and beverage bill from the

Bayou Classic football game from Businessperson A with the intent to influence his conduct in

relation to his position, employment, and duty, that is, **LEWIS** agreed to accept the money in

exchange for providing Businessperson A with an official letter including a false statement

intended to convince other mayors to contract for the Cifer 5000 (hereinafter referred to as "the

mayor letter"), in violation of Title 14, Louisiana Revised Statutes, Section 118.

17)     Racketeering Act Four: Public Bribery

On or about October 26, 2009, in the Middle District of Louisiana, **LEWIS**, a public

official, did agree to accept tickets to a New Orleans Saints versus the New England Patriots

football game worth approximately $2,558 from Businessperson B with the intent to influence

his conduct in relation to his position, employment, and duty, that is, **LEWIS** agreed to accept

the tickets in exchange for providing Businessperson B with an official letter of support directed

to the U.S. Environmental Protection Agency in connection with a $3,000,000 to $4,000,000

grant request for the Cifer 5000, in violation of Title 14, Louisiana Revised Statutes, Section 118.

18)     Racketeering Act Five: Public Bribery

On or about January 14, 2010, in the Eastern District of Louisiana, **LEWIS** and **SMITH**,

public officials, did agree to accept cash, dinner, and hotel stays totaling at least $1,200 from the

Businesspeople with the intent to influence their conduct in relation to their positions,

employment, and duty, that is, **LEWIS** and **SMITH** agreed to accept the cash, dinner and hotel

stays in exchange for causing **SMITH** to provide the Businesspeople with confidential law

enforcement information concerning E.G., V.S., J.M. and C.N., in violation of Title 14, Louisiana Revised Statutes, Section 118.

19)     <u>Racketeering Act Six</u>: Public Bribery

On or about January 29, 2010, in the Middle District of Louisiana, **SMITH**, a public official, did agree to accept tickets to a basketball game between the New Orleans Hornets and the Los Angles Lakers worth approximately $290 from Businessperson B with the intent to influence his conduct in relation to his position, employment, and duty, that is, **SMITH** agreed to accept the tickets in exchange for **SMITH** continuing to provide the Businessperson B with confidential law enforcement information, in violation of Title 14, Louisiana Revised Statutes, Section 118.

20)     <u>Racketeering Act Seven</u>: Public Bribery

On or about February 20, 2010, in the Middle District of Louisiana, **SMITH**, a public official, did solicit and agree to accept between $500 and $1,000 from Businessperson B with the intent to influence his conduct in relation to his position, employment, and duty, that is, **SMITH** agreed to accept the money in exchange for **SMITH** continuing to provide Businessperson B with confidential law enforcement information, in violation of Title 14, Louisiana Revised Statutes, Section 118.

21)     <u>Racketeering Act Eight</u>: Public Bribery

On or about February 24, 2010, in the Middle District of Louisiana, **SMITH**, a public official, did agree to accept between $700 and $1,000 from Businessperson B with the intent to influence his conduct in relation to his position, employment, and duty, that is, **SMITH** agreed to accept the money in exchange for writing an official letter to a state prosecutor in New Haven,

Connecticut, seeking leniency for an individual who **SMITH** believed was facing drug charges, in violation of Title 14, Louisiana Revised Statutes, Section 118.

22)     Racketeering Act Nine: Public Bribery

On or about March 23, 2010, in the Middle District of Louisiana, **SMITH**, a public official, did agree to accept $500 from Businessperson B with the intent to influence his conduct in relation to his position, employment, and duty, that is, **SMITH** agreed to accept the money in exchange for **SMITH** providing Businessperson B with confidential law enforcement information, in violation of Title 14, Louisiana Revised Statutes, Section 118.

23)     Racketeering Act Ten: Public Bribery

On or about March 24, 2010, in the Middle District of Louisiana, **SMITH**, a public official, did agree to accept $800 from Businessperson B with the intent to influence his conduct in relation to his position, employment, and duty, that is, **SMITH** agreed to accept the money in exchange for **SMITH** causing the dismissal of a ticket issued by the Louisiana State Police and a ticket issued by the Port Allen City Marshal, in violation of Title 14, Louisiana Revised Statutes, Section 118.

24)     Racketeering Act Eleven: Public Bribery

On or about April 29, 2010, in the Middle District of Louisiana, **SMITH**, a public official, did solicit cash from Businessperson B with the intent to influence his conduct in relation to his position, employment, and duty, that is, **SMITH** solicited the cash in exchange for **SMITH** providing Businessperson B with confidential law enforcement information, in violation of Title 14, Louisiana Revised Statutes, Section 118.

25) <u>Racketeering Act Twelve</u>: Public Bribery

On or about May 4, 2010, in the Middle District of Louisiana, **SMITH**, a public official, did agree to accept $700 in cash from Businessperson B with the intent to influence his conduct in relation to his position, employment, and duty, that is, **SMITH** agreed to accept the cash in exchange for **SMITH** providing Businessperson B with a Port Allen Police Department Sergeant's badge and a commission card to allow Businessperson B to become an official member of the Port Allen Police Department, in violation of Title 14, Louisiana Revised Statutes, Section 118.

All in violation of Title 18, United States Code, Section 1962(c).

## COUNTS TWO THROUGH SIX

### MAIL FRAUD
### <u>INVOLVING THE CIFER 5000</u>

26) Paragraphs 1 through 6 of this Indictment are incorporated herein.

### <u>The Scheme</u>

27) From in or about October 2008, through in or about June 2010, in the Middle District of Louisiana and elsewhere, **DEREK A. LEWIS**, defendant herein, devised and intended to devise, and attempted to do so, a scheme to defraud the citizens of the City of the right to the honest services of **LEWIS** and Johnson in the affairs of the City, by means of false and fraudulent material pretenses, representations, and promises.

28) The scheme was for **LEWIS** to obtain cash and other things of value from the Businesspeople in exchange for using his position as Mayor to promote and to obtain money for the Cifer 5000.

29)     The scheme to defraud was executed in the following manner:

a.      On or about October 6, 2008, at the invitation of Public Official A, **LEWIS** met with the Businesspeople at a condominium in New Orleans along with Public Officials A, B, and C.  Prior to the meeting, Public Official A had accepted bribes from Businessperson B and indicated to Businessperson B that **LEWIS** and Public Officials B and C operated like Public Official A, in that they would also accept bribes in connection with their official positions.  During the meeting, Public Official A obtained $2,000 in cash from Businessperson A and subsequently provided some of the cash to **LEWIS**.  In addition to cash, **LEWIS** and the other public officials also accepted tickets to a football game between the New Orleans Saints and the Minnesota Vikings and rooms at a luxury hotel worth a total of approximately $2,293 from the Businesspeople.

b.      On or about October 10, 2008, **LEWIS** solicited Businessperson B for two tickets to a football game between the Saints and the Oakland Raiders worth approximately $345.  Businessperson B responded, "Whatever you say you want, I want to see can I make it happen . . . cause I'm going to be begging you to make things happen for me."  **LEWIS** replied, "I know, I know" and explained that he asked Businessperson B for the tickets since he had a meeting with Businessperson B arranged for the following week.  As **LEWIS** requested, the tickets were sent to him the following day via Federal Express.

c.     On or about October 13, 2008, **LEWIS** solicited Businessperson B for four (4) tickets to a Monday Night football game involving the New Orleans Saints. Businessperson B agreed to provide **LEWIS** the tickets and discussed their upcoming business meeting.

d.     On or about November 17, 2008, **LEWIS** and Businessperson B discussed setting up a meeting. **LEWIS** explained that he was in the process of trying to find a spot to park two Recreational Vehicles (RV) at the Bayou Classic football game. Businessperson B offered to take care of it. **LEWIS** agreed and the two subsequently arranged to meet the following day. Later that day, Businessperson B informed **LEWIS** that he purchased two parking spaces for approximately $400. **LEWIS** accepted the tickets with the understanding that **LEWIS** would pay Businessperson B back through favorable official action.

e.     On or about November 18, 2008, **LEWIS** and Johnson met with the Businesspeople at a restaurant in New Orleans. The purpose of the meeting was to discuss the Cifer 5000 and the possibility of contracting with the City. During the meeting, Johnson asked whether Businessperson A could help out Johnson and **LEWIS** with tickets to the Bayou Classic football game. Businessperson A responded that he would take it under consideration. Johnson then asked whether Businessperson A had a suite at the game, to which Businessperson A responded no. Later during the meeting, Businessperson A explained that he was seeking letters of support from the City in order to generate additional money from investors. **LEWIS** and Johnson agreed to provide such official letters in exchange for tickets to the Bayou Classic football game. Johnson

explained that this arrangement was "between us...me, you, the mayor, and this table here... " and that he planned to bring ten people.

   f.    Later, on or about November 18, 2008, **LEWIS** and Businessperson A arranged for **LEWIS** and Johnson to have a luxury suite at the Bayou Classic worth approximately $8,260. Businessperson A informed **LEWIS** that the expense of the luxury suite was worth it since the letters from **LEWIS** and Johnson would help secure approximately $2,000,000 to $3,000,000 from investors for the Cifer 5000.

   g.    On or about November 19, 2008, **LEWIS** read the draft support letter on his computer while on the telephone with Businessperson A. When finished, Businessperson A asked **LEWIS** if everything looked good, **LEWIS** replied, "yeah" and explained that he would coordinate with Johnson to ensure both letters were ready. Later that day, two letters of support from **LEWIS** and Johnson were faxed from the Port Allen City Hall to Businessperson B in New Orleans. **LEWIS**'s letter provided:

> The City of Port Allen, Louisiana is committed to working towards a contract with [Businessperson B's company] to clean our City's residential waste containers using the Cifer 5000. I make this commitment on behalf of the City after learning about your company and the services it could provide our citizens. Also, I have presented this issue to the City Council and each of its members has expressed support for engaging your services. Be assured that I will take whatever steps are necessary in my position as Mayor [a City Council member] to ensure that the City makes a good faith effort to reach a final agreement with [Businessperson B's company] that is both fair and reasonable.

Johnson's letter was identical except he states his position as a City Council member, not mayor. Contrary to the representations made in both letters, the other members of the City Council had not been presented with the issue and had not expressed support for engaging the Cifer 5000 services.

h.	On or about November 20, 2008, an envelope containing the two signed letters from **LEWIS** and Johnson, bearing their official letterhead was sent via U.S. Mail from Port Allen, Louisiana, to Dallas, Texas.  The same day, Businessperson B asked **LEWIS** what he thought of the letter.  **LEWIS** responded, "It's good."

i.	On or about November 26, 2008, **LEWIS** solicited Businessperson B to pay for the food for **LEWIS** and his guests at the suite at the Bayou Classic football game.  Businessperson B said he would check it out.  Businessperson B also reiterated that **LEWIS** was receiving the tickets only because **LEWIS** was using his position as Mayor to help the Businesspeople.

j.	On or about November 28, 2008, **LEWIS** solicited Businessperson A to pay for the food at the suite.  Businessperson A explained that food was not included in the price of the suite, but that Businessperson A would cover food costs up to $1,000 since **LEWIS**' letter of support helped the Businesspeople tremendously.  When asked about the letter, **LEWIS** confirmed that he had reviewed it.

k.	On or about November 29, 2008, **LEWIS** and Johnson attended the Bayou Classic football game with over twenty members of their friends and family, not the Businesspeople.  While at the game, **LEWIS** caused himself and his guests to accumulate a food and beverage bill totaling approximately $1,513 with tip included.

l.	On or about December 1, 2008, **LEWIS** informed Businessperson B that he had over 40 people at the suite and that the food and beverage bill came to over $1,500.  Businessperson B stated that the money did not matter as long as **LEWIS** was "helping [Businessperson A] get to where [Businessperson A] wants to be."  **LEWIS**

stated that he would fax the receipt to Businessperson B and that he would like to get the money before the next Saints game. The same day, **LEWIS** informed Businessperson A of the $1,500 bill. Businessperson A responded that the bill was more than Businessperson A expected since they had agreed to keep it under $1,000, but that Businessperson A would work something out.

m. On or about December 5, 2008, **LEWIS** complained to Businessperson B about a vendor associated with **LEWIS**'s outside employment who had promised **LEWIS** four tickets to the Saints game, but only provided him with two. **LEWIS** stated that the vendor "treated them like shit." However, **LEWIS** complimented the Businesspeople and stated that he was ready to "get rolling, let's put it in action...wheels of government kinda slow, but I don't want them to turn that slow..." [reference to contracting for the Cifer 5000]."

n. On or about December 10, 2008, **LEWIS** and Businessperson A discussed the food and beverage bill. During the discussion, **LEWIS** agreed to provide the Businesspeople with a letter of support that could be used to convince other mayors to contract for the Cifer 5000 (hereinafter referred to as "the mayor letter").

o. On or about December 12, 2008, **LEWIS** told Businessperson A that he had received a draft of the mayor letter. **LEWIS** agreed when Businessperson A asked **LEWIS** to "take a look at it, read it over, [and] give [Businessperson A] a call if you have any questions on anything."

p.      On or about December 15, 2008, **LEWIS** met with the Businesspeople in New Orleans.  During this meeting, they discussed how the mayor letter would help Businessperson A raise an additional $1,500,000 from private investors.  Businessperson A also paid **LEWIS** $1,520 in cash to cover the food and beverage expenses **LEWIS** and his guests incurred at the Bayou Classic football game.  **LEWIS** expressed relief that Businessperson A was paying him in cash, stating: "...I thought you was gonna write a check, and I said shit."  After receiving the cash, **LEWIS** stated: "I really appreciate this, I'll do whatever..."

q.      On or about December 16, 2008, **LEWIS** met with the Businesspeople in Port Allen.  **LEWIS** provided the Businesspeople with the mayor letter.  Businessperson A explained that the mayor letter would put him in a good position to secure $1,500,000 in investment money next month.  The mayor letter, which is signed by **LEWIS** as Mayor and bears official letterhead, reads:

> As Mayor of the City of Port Allen, Louisiana, I am writing to commend [Businessperson A] and [Businessperson A's company] for their outstanding work on behalf of our city. [Businessperson A] and his company were contracted by the city to clean our residents' waste containers using the Cifer 5000.  The results were outstanding and well-worth the cost, a sentiment shared by the city government and residents alike.  Our city is now a cleaner and safer place thanks to the Cifer 5000.

r.      On or about January 1, 2009, **LEWIS** solicited Businessperson B for tickets to New Orleans Hornets basketball games.  **LEWIS** explained that he "got [Businessperson A] the letter, did everything he was asked to do."  Businessperson B agreed to provide tickets in exchange for **LEWIS** setting up meetings with other mayors

to pitch the Cifer 5000. **LEWIS** stated that he wanted 12 tickets and that he favored having a suite at the games.

s. In or about January 2009, **LEWIS** arranged for he and the Businesspeople to have lunch on January 14, 2009, with H.R., the mayor of a Baton Rouge area municipality, for the purpose of discussing the Cifer 5000. Before the lunch, **LEWIS** and Businessperson A privately discussed **LEWIS** seeking a City ordinance beneficial to the Cifer 5000 in order to further impress potential investors. At the lunch, nothing corrupt occurred. H.R. did not solicit anything. Nor did he give any indication of corrupt tendencies. The Businesspeople had no further contact with H.R.

t. On or about January 28, 2009, **LEWIS** met with the Businesspeople at a restaurant in Baton Rouge. During the meeting, they discussed **LEWIS** getting additional tickets from them. **LEWIS** joked that he "didn't need to be rewarded every time they met . . . couldn't [Businessperson B] just get the tickets [for **LEWIS**] out of the goodness of his heart." Businessperson B replied that buying the tickets would be to advance business, not out of the goodness of his heart.

u. On or about February 10, 2009, **LEWIS** agreed to propose a City ordinance to the Port Allen City Council. The proposed ordinance was drafted by the Businesspeople for the purpose of ensuring that the City would contract for the Cifer 5000.

v. On or about October 26, 2009, **LEWIS** solicited Businessperson B for tickets to a football game between the New Orleans Saints and the New England Patriots. Businessperson B responded that the tickets could be provided in exchange for **LEWIS**

providing a letter of support for the Cifer 5000 receiving a grant worth $3,000,000 to $4,000,000. **LEWIS** agreed, replying: "Put the letter together, and I'll do whatever I can for you."

w.     On or about October 27, 2009, **LEWIS** told Businessperson B to mail the Saints/Patriots tickets, which **LEWIS** had been told were purchased at a cost of $2,600, to a post office box in Port Allen, Louisiana. During this same phone conversation, **LEWIS** assured Businessperson B that he would get the grant letter done by the next morning.

x.     On or about November 5, 2009, **LEWIS** caused a signed letter bearing his official letterhead to be mailed to Businessperson B in New Orleans, Louisiana. The letter was from **LEWIS** and was directed to the Administrator for the U.S. Environmental Protection Agency.

y.     On or about November 9, 2009, as **LEWIS** requested, the Saints/Patriots tickets were sent via certified U.S. Mail to **LEWIS**'s P.O. Box in Port Allen, Louisiana.

z.     On or about November 30, 2009, **LEWIS** thanked Businessperson B for the tickets to the Saints/Patriots game. Businessperson B asked **LEWIS** whether he had told people how he had twisted Businessperson B's arm for the tickets. **LEWIS** responded, "I didn't twist your arm, I damn near broke it off."

aa.     On or about June 9, 2010, **LEWIS** met with Businessperson B and Public Officials A, B, and C at a restaurant in Baton Rouge, Louisiana. During the meeting, Businessperson B explained that Public Official C wanted to receive a percentage of the business that he brought to the Cifer 5000.

bb.    On or about June 11, 2010, during a phone conversation between **LEWIS**

and Businessperson B, **LEWIS** indicated to Businessperson B that he wanted the same

arrangement as Public Official C.

### The Mailings

30)    On or about the following dates, in the Middle District of Louisiana and

elsewhere, **DEREK A. LEWIS,** defendant herein, having devised and intended to devise the

above described scheme, for the purpose of executing the scheme and attempting to do so,

knowingly caused to be delivered by the United States mail or by a commercial interstate carrier,

the mailings described below, each of which constitutes a separate count:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| 2 | 10/10/2008 | **LEWIS** caused tickets to the Saints/Raiders football game to be sent via FedEx from New Orleans, Louisiana to Port Allen, Louisiana. |
| 3 | 11/20/2008 | **LEWIS** caused the Investor Letters to be mailed from Port Allen, Louisiana, to Dallas, Texas. |
| 4 | 11/21/2008 | **LEWIS** caused tickets to the Bayou Classic football game to be sent via FedEx from New Orleans, Louisiana to Port Allen, Louisiana. |
| 5 | 11/05/2009 | **LEWIS** caused the EPA Letter to be mailed from Port Allen, Louisiana to New Orleans, Louisiana. |
| 6 | 11/09/2009 | **LEWIS** caused tickets to the Saints/Patriots football game to be sent via U.S. Mail from Metairie, Louisiana, to Port Allen, Louisiana. |

Each of the above is a violation of Title 18, United States Code, Sections 1341, 1346, and

2.

## COUNTS SEVEN THROUGH TEN

## MAIL AND WIRE FRAUD INVOLVING CONFIDENTIAL INFORMATION, TICKETS, BADGES, AND A POLICE COMMISSION

31)     Paragraphs 1, 2, 4, 5 and 6 of this Indictment are incorporated herein.

### The Scheme

32)     From in or about November 2009, through in or about April 2010, in the Middle District of Louisiana and elsewhere, **DEREK A. LEWIS** and **FREDERICK W. SMITH**, defendants herein, devised and intended to devise, and attempted to do so, a scheme to defraud and to obtain property from the Federal Bureau of Investigation ("FBI"), specifically confidential information, and to defraud the citizens of the City of their right to the honest services of **SMITH** and **LEWIS** in the affairs of the City, by means of false and fraudulent material pretenses, representations, and promises.

33)     The scheme was to obtain cash and other things of value from the Businesspeople in exchange for **SMITH** corruptly dismissing tickets and providing the Businesspeople with confidential law enforcement information, badges, and a police commission.

34)     The scheme to defraud was executed in the following manner:

a.      On or about November 24, 2009, **LEWIS** told Businessperson B that **LEWIS** could cause **SMITH** to obtain criminal and driving histories concerning various individuals for Businessperson B.  As the Chief of Police, **SMITH** had access to such confidential law enforcement information through computer databases accessible by law enforcement agencies.  One such database was NCIC which was operated by the FBI.  To obtain the information from NCIC, **SMITH** was required to identify the purpose for obtaining the information.

b.      On or about December 1, 2009, **LEWIS** agreed to have **SMITH** obtain

confidential law enforcement information for Businessperson B concerning two

individuals identified by Businessperson B as D.B. and C.N.  **SMITH** subsequently

obtained the information, falsely representing to NCIC that he was obtaining the

information for criminal justice purposes.

c.      On or about December 2, 2009, **LEWIS** faxed the confidential law

enforcement information for D.B. to Businessperson B.

d.      On or about January 7, 2010, **LEWIS** and Businessperson B discussed

how **SMITH** would be compensated for providing the confidential law enforcement

information.  **LEWIS** explained that **SMITH** "didn't want pay, but when we need a

favor, maybe this or that.  Like he might be coming down to New Orleans to do a little

something and need a get away room."  Arrangements were made for **LEWIS** and

**SMITH** to visit New Orleans the following week.

e.      On or about January 11, 2010, Businessperson B provided **LEWIS** with

four additional names, C.N., E.G., V.S. and J.M., for **SMITH** to obtain confidential law

enforcement information in exchange for "a little side income."  **LEWIS** stated, "Alright,

I'll get it to him and let you know something."  Businessperson B replied, "I'll take care

of you when you get here [New Orleans]."

f.      On or about January 14, 2010, **LEWIS** informed Businessperson B that he

would not forget to bring the confidential law enforcement information concerning C.N.,

E.G., V.S. and J.M. to New Orleans that night, stating, "I ain't getting paid to forget...I

ain't do nothing that I ain't gettin paid to do."  **SMITH** subsequently caused one of his

employees to contact the West Baton Rouge Parish Office of Homeland Security to request the confidential law enforcement information sought by Businessperson B.  When pressed on the law enforcement purpose for obtaining the information, **SMITH** falsely represented that the information was being sought in connection with a burglary investigation being conducted by the Port Allen Police Department.  After providing such false reason, **SMITH** obtained the confidential law enforcement information.  That night, **LEWIS** and **SMITH** accepted cash, dinners, and hotel stays worth at least $1,200 from the Businesspeople in exchange for the confidential law enforcement information. **SMITH** informed the Businesspeople that he could give them a hard copy of the information, but that he would have to transfer the information to a blank piece of paper to disguise the fact that **SMITH** had obtained the information.

g.      On or about January 19, 2010, Businessperson B informed **SMITH** that the Businesspeople had other individuals for whom they wanted confidential law enforcement and asked whether **SMITH** was interested in continuing the arrangement. **SMITH** responded "absolutely" that he was interested and that he would get some of the confidential law enforcement information for the Businesspeople that day.

h.      On or about January 21, 2010, **SMITH** informed Businessperson B that he had obtained the confidential law enforcement information for the Businesspeople and put the information on a piece of paper that would not identify **SMITH**'s involvement or the source of the information.  Businessperson B responded by assuring **SMITH** that the tickets Businessperson B promised were forthcoming, stating: "I did get those tickets [to the basketball game between the New Orleans Hornets and the Los Angeles Lakers] like I

said when I seen you." **SMITH** replied, "that's awesome." When **SMITH** inquired about the location of the seats, Businessperson B stated, "In the super suite, it's huge, got 4 or 5 banks of food, wine and drinks are free." **SMITH** again responded, "that's awesome." **SMITH** continued, "That's good man, I appreciate it." Businessperson B responded, "I appreciate what you doing for us. When can you get that done [reference to providing confidential law enforcement information]?" **SMITH** replied, "It's in my truck, so all I got to do when I get to work in the morning is transfer it over to something so I can get it to ya." Later during the same conversation, Businessperson B stated that, if **SMITH** "took care of" providing the confidential law enforcement information, then Businessperson B would provide **SMITH** with tickets for the Hornets basketball games involving the Boston Celtics and Portland Trailblazers. **SMITH** responded, "Alright, well that's good. What I'm gonna do, I'm going to call tomorrow and decide how I'm gonna get that information to you."

      i.     On or about January 28, 2010, Businessperson B received a one page fax from **SMITH**. The fax contained **SMITH**'s hand written notes indicating the results of the confidential law enforcement inquiries he had ran on D.S., M.W., and W.R. **SMITH** wrote that D.S. and M.W. were "all clear" but W.R. had an expired driver's license.

      j.     On or about January 29, 2010, **SMITH** and Businessperson B discussed which basketball tickets **SMITH** wanted for helping the Businesspeople. Businessperson B explained that **SMITH** would be receiving the tickets "since you give me so much help and I trying to keep you in that loop of giving me help. I told you which tickets I had right, the Lakers, Boston, Portland, Utah, so I need to know what you want before I give

them to somebody else." **SMITH** replied, "Them Lakers is what I want." **SMITH** asked, "Is it just for me or if I wanted to bring somebody . . . just one person?" Businessperson B responded, "I'm giving you two tickets." **SMITH** replied, "That's what I'm talking about . . . You gonna be there?" Businessperson B stated, "I'm trying to make sure that you continue to help me, I'm not trying to buy these tickets for me. I'm trying to take care of my business." **SMITH** responded, "I appreciate it."

      k.      On or about February 4, 2010, **LEWIS** told Businessperson B that **SMITH** wanted Businessperson B to stop talking about money over the telephone, presumably fearing that the phones may be tapped.

      l.      On or about February 20, 2010, **SMITH** complained to Businessperson B that Businessperson B had not called him recently. **SMITH** explained that he had no problem with what they had been doing and would continue to help Businessperson B. **SMITH** solicited Businessperson B for a hotel room at a casino in Marksville, Louisiana, for **SMITH** and a companion. In response, Businessperson B agreed to reimburse **SMITH** for "whatever he wants down there [Marksville]" if **SMITH** can "hook up" Businessperson B with confidential law enforcement information concerning additional individuals. As the two discussed the logistics of getting **SMITH** the money, **SMITH** explained that his need for money for the trip "was one of the reasons why he was calling [Businessperson B]." When asked how much he wanted, **SMITH** responded, "$500 to $600 would be good." **SMITH** and Businessperson B then agreed that Businessperson B would reimburse **SMITH** up to $1,000.

m.      On or about February 24, 2010, **SMITH** agreed to sign and submit an official letter of support for an individual who purportedly was facing drug charges in Connecticut in exchange for being reimbursed "between seven and a thousand [dollars]" for **SMITH**'s expenses in Marksville.  Later that day, **SMITH** called Businessperson B to determine if they could meet soon because "I need to get my package [reference to the money]."  They arranged a meeting and **SMITH** explained, "I'm gonna put this letter on letterhead, and I'm gonna sign it."  That evening, Businessperson B gave **SMITH** the Hornets/Lakers tickets and $1,000 in cash.  **SMITH** and Businessperson B subsequently had a telephone conversation, during which **SMITH** thanked Businessperson B for the basketball tickets, stating, "I'm going to enjoy it, I appreciate it, and I'm gonna take care of you guys like you take care of me."  **SMITH** stated further that he would "take care" of getting Businessperson B the letter.

n.      On or about March 8, 2010, **SMITH** informed Businessperson B that he wanted to give the leniency letter to Businessperson B in-person instead of faxing it. Also, in an effort to obtain another bribe payment, **SMITH** asked whether Businessperson B wanted confidential law enforcement information pertaining to anyone else.  Businessperson B said that he had two other individuals, but that he did not want to bother **SMITH** with them.  **SMITH** insisted, stating, "You not bothering me . . . you don't even need to think that way."  Businessperson B agreed to provide the two names to **SMITH** and to meet **SMITH** the following day in Gonzales, Louisiana.

o.     On or about March 9, 2010, **SMITH** and Businessperson B met at a restaurant in Gonzales.  They discussed the leniency letter and **SMITH** explained that its impact will come down to the District Attorney talking to the judge about all the letters received.  When Businessperson B made a comment about a ticket, **SMITH** announced, "I fix tickets."  During this meeting, **SMITH** also provided Businessperson B with a piece of paper containing confidential law enforcement information concerning J.P.

p.     On or about March 23, 2010, **SMITH** and Businessperson B talked about the status of the leniency letter. Businessperson B explained that Businessperson A wanted the money back ($1,000) if the letter was not forthcoming.  **SMITH** responded, "Okay, where you at . . . I'll be there in about 20 minutes."  **SMITH** subsequently told Businessperson B, "I give you my word I'm going to take care of you in the morning." While discussing **SMITH** fixing a ticket, Businessperson B explained that Businessperson B did not mind paying in exchange for **SMITH** doing something for Businessperson B.  **SMITH** replied, "Don't think every time you asked me to do something you gonna have to do that . . . don't gotta be all that all the time."  The same day, **SMITH** provided Businessperson B with a sheet of paper containing the handwritten confidential law enforcement information concerning J.M.  In exchange for the information, Businessperson B paid **SMITH** $500.

q.     On or about March 24, 2010, **SMITH** and Businessperson B met at the Port Allen Police Department.  During the meeting, **SMITH** used his desktop computer to type the leniency letter, which asked a court in Connecticut to have leniency on an individual facing drug charges who **SMITH** did not know.  Despite not knowing the

individual, **SMITH** wrote, "I would like to ask the court for assistance in this matter that Joshua has placed himself in because I believe this incident will act as a learning experience for Joshua and that the courts will not see Joshua in this matter again." Businessperson B told **SMITH** that **SMITH** did not have to tell Businessperson B what he was doing with the money Businessperson B had paid him for the letter. **SMITH** replied, "I hope not."

     r.      On or about March 24, 2010, during the aforementioned meeting at the Port Allen Police Department, **SMITH** and Businessperson B also discussed the "fixing" of two tickets. One ticket was issued to K.S. by the Louisiana State Police (LSP) and the other was issued to Businessperson B by the Port Allen City Marshal. Businessperson B asked **SMITH** how Businessperson B would know that the tickets had been dismissed. **SMITH** explained, "You'll get a letter on this one [LSP ticket]. A letter will be sent to [K.S.] . . . . On this one [Marshal ticket], city court doesn't send out letters so you will have to get with me before your court date." With regard to the amount of the bribe, **SMITH** asked, "what number we said on the phone?" Businessperson B responded, "You told me . . . I believe . . . $350 twice." **SMITH** replied by writing $800 on a piece of paper and pointing to the number, stating, "That would take care of me right here." Businessperson B asked, "$860?" **SMITH** replied, "No . . . eight, zero, zero." The two arranged to meet the next day for payment.

     s.      On or about March 24, 2010, **SMITH** had a telephone conversation with Businessperson B, during which **SMITH** "wanted to see if I could get $750 . . .that would cover for next month... if you got any license plates or anything else [reference to

confidential law enforcement information]." Businessperson B responded that they could talk about it more when Businessperson B got back to town.

      t.      On or about March 25, 2010, **SMITH** and Businessperson B met in Gonzales, Louisiana, during which Businessperson B paid **SMITH** $800 cash to "fix" the two tickets. While **SMITH** counted the money, Businessperson B stated, "That [the money] takes care of my little tickets, I don't want you to bring that up any more." **SMITH** responded, "Yeah, counting too fast." Businessperson B then asked, "What about the other deal? The possibility that me and [Businessperson A] can get the badge." **SMITH** stated, "Do you need a commission or a badge? You need both really." **SMITH** explained that the commission can be used to influence people and get out of tickets. **SMITH** asked what other police equipment the Businesspeople wanted.

      u.      On or about March 28, 2010, **SMITH** confirmed that Businessperson B "just want them [police] lights and all that." Businessperson B responded, "yeah, whatever we can get...got a shopping list." Later in the conversation, in response to **SMITH** asking what else the Businesspeople wanted, Businessperson B inquired about **SMITH**'s department having an evidence room. When **SMITH** responded "yeah" Businessperson B then asked **SMITH** to "tell me what you got that you can get away with...and you tell me what it's gonna cost me...so I can, you know, take care of you on that one." **SMITH** said, "sounds good to me" and agreed to take a look at the evidence room for Businessperson B.

v.      On or about March 29, 2010, **SMITH** told Businessperson B that he had looked in the "vault" [evidence room], stating: "A lot of it is junk . . .got a few things... will look at passing on to you tomorrow." **SMITH** said he would call Businessperson B after getting home from the basketball game [reference the Hornets/Lakers basketball game].

w.      On or about April 2, 2010, **SMITH** provided Businessperson B with an official Port Allen Police Department Lieutenant's badge and informed Businessperson B that he would commission Businessperson B as a reserve police officer. **SMITH** stated that, once Businessperson B was a commissioned police officer, Businessperson B could ask for "officer courtesy" to get out of tickets whenever stopped by law enforcement. During this discussion, Businessperson B provided **SMITH** with $500 cash and two tickets to a basketball game between the New Orleans Hornets and the Charlotte Bobcats. After receiving the cash and tickets, **SMITH** mentioned that he had ordered two police lights for the Businesspeople and that he was taking care of the Businesspeople because they took care of him. In an attempt to solicit another bribe payment, **SMITH** stated that he wanted to get a six month lease on a condominium in New Orleans where he could go to relax without his wife knowing about it. Businessperson B did not take **SMITH** up on his solicitation attempt.

x.      On or about April 26, 2010, **SMITH** told Businessperson B, "I got you a Sergeant's badge." Businessperson B responded by telling **SMITH** that Businessperson B had recently used the Lieutenant's badge to get out of a ticket. **SMITH** responded, "There you go."

y.      On or about April 29, 2010, **SMITH** informed Businessperson B, "We can make the badge happen today . . . you don't have any licenses, anything else you need ran [confidential law enforcement]?" Businessperson B responded, "I can check it out. You got both of the badges today?" **SMITH** replied, "I definitely got one for sure. The other one I have, I'm waiting on another officer badge, the only thing I have is major and captain. I can't release those. I do have one sergeant that I'm letting you have, giving you that one."

z.      Later on or about April 29, 2010, **SMITH** continued to solicit another bribe from Businessperson B, stating "Hey, look, you and [Businessperson A] don't have no more license plates or nothing? I'm trying to get me some weekend passes, weekend cash for this weekend, trying to get some stuff done." Businessperson B responded that **SMITH** "would have had some [cash]" if **SMITH** already had the police lights for the Businesspeople.

aa.     Later on or about April 29, 2010, **SMITH** and Businessperson B agreed that **SMITH** would provide two additional police badges instead of the police lights. **SMITH** explained that he had one of the badges available, but needed to get a second one. The two then discussed the fixing of K.S.'s ticket. Even though Businessperson B had already given **SMITH** money for fixing the ticket, **SMITH** sought more, stating: "I took care of that other little issue, that ticket you gave me . . ." Businessperson B responded, "You got rid of [K.S.'s] ticket?" **SMITH** replied, "Yeah, I took care of [K.S.'s] ticket so you need to see me anyway you see." Businessperson B objected, stating: "What you mean, I took care of you . . . more than that piece of little ticket cost,

way more."  The same day, the District Attorney's Office mailed a letter to K.S. stating that the ticket had been dismissed.

   bb. On or about May 4, 2010, **SMITH** informed Businessperson B that **SMITH** was just leaving his office to meet Businessperson B in Gonzales, Louisiana. **SMITH** explained that "the file cabinet where I had the officer's badge, the captain has the key on that, so I got one in the car, and I just need to get that one to you maybe tomorrow or something. . . . .  The file cabinet was locked.  I had the other one in my office."  Later, **SMITH** informed Businessperson B, "I'm gonna get the other badge. . . . . You gonna make a nice contribution the campaign for me?  You gonna help me out?" Businessperson B responded, "We gonna do whatever we can to support you Chief, you ain't gotta worry about that."  Later that day, **SMITH** and Businessperson B met in Gonzales, Louisiana.  During the meeting, **SMITH** received $700 in cash from Businessperson B in exchange for a Port Allen Police Department Sergeant's badge and a commission card.

### The Wires and Mailing

35) On or about the following dates, in the Middle District of Louisiana and elsewhere, the below named defendants, having devised the above described scheme, for the purpose of executing the scheme, and attempting to do so, knowingly caused the below described mailing and transmissions by means of wire communication in interstate commerce, each mailing and transmission constituting a separate count:

| COUNT | DEFENDANT(S) | DATE | DESCRIPTION |
|---|---|---|---|
| 7 | SMITH LEWIS | 12/01/2009 | Obtained criminal history information regarding C.N. from the National Crime Information Center (NCIC) database in West Virginia by accessing such database through a computer in the Middle District of Louisiana. |
| 8 | SMITH LEWIS | 12/01/2009 | Obtained criminal history information regarding D.B. via a computer network based in Arizona through a computer in the Middle District of Louisiana. |
| 9 | SMITH | 03/23/2010 | Obtained criminal history information regarding J.M. from the National Crime Information Center (NCIC) database in West Virginia by accessing such database through a computer in the Middle District of Louisiana. |
| 10 | SMITH | 04/29/2010 | SMITH caused the mailing of a letter sent via U.S. Mail from the District Attorney's Office in Port Allen, Louisiana to K.S. in New Orleans, Louisiana, concerning the dismissal of a ticket. |

Each of Counts 7, 8, and 9 is a violation of Title 18, United States Code, Sections 1343, 1346, 2, and Count 10 is a violation of Title 18, United States Code, Sections 1341, 1346, and 2.

## COUNTS 11 THROUGH 22

### USE OF AN INTERSTATE FACILITY
### IN AID OF RACKETEERING

36)     Paragraphs 1, 2, 4, 5 and 6 of this Indictment are incorporated herein.

37)     On or about the following dates, the defendant(s) listed below used a facility in interstate commerce, that is, a telephone, with the intent to promote, manage, establish and carry on, and to facilitate the promotion, management, establishment, and carrying on of an unlawful activity, that is, bribery, in violation of Title 14, Louisiana Revised Statutes, Section 118, and

thereafter did perform and attempt to perform an act, as described below, to promote, manage, establish and carry on, and to facilitate the promotion, management, establishment, and carrying on of said unlawful activity, each use of an interstate facility (telephone) constituting a separate count:

| COUNT | DEFENDANT(S) | DATE | DESCRIPTION OF SUBSEQUENT ACT |
|-------|--------------|------|-------------------------------|
| 11 | **LEWIS** | 10/10/2008 | **LEWIS** solicited and agreed to accept football tickets to the Saints/Raiders game from Businessperson B. |
| 12 | **LEWIS** | 10/13/2008 | **LEWIS** solicited Businessperson B for tickets to the New Orleans Saints versus Oakland Raiders football game. |
| 13 | **LEWIS** | 11/18/2008 | **LEWIS** agreed to accept tickets to a luxury suite to watch the Bayou Classic football game from the Businesspeople, in exchange for providing an investor letter. |
| 14 | **LEWIS** | 11/26/2008 | **LEWIS** solicited Businessperson B to pay for the food for **LEWIS** and his guests at the Bayou Classic football game. |
| 15 | **LEWIS** | 12/10/2008 | **LEWIS** solicited and agreed to accept payment of approximately $1,520 from Businessperson A in exchange for providing the mayor letter. |
| 16 | **LEWIS** | 10/26/2009 | **LEWIS** accepted tickets to a New Orleans Saints versus Patriots football game from Businessperson B in exchange for providing a letter of support. |
| 17 | **SMITH** | 01/29/2010 | **SMITH** agreed to accept tickets to a New Orleans Hornets versus Los Angeles Lakers basketball game from Businessperson B, in exchange for providing confidential law enforcement information. |
| 18 | **SMITH** | 02/20/2010 | **SMITH** agreed to accept between $500 and $1,000 from Businessperson B, in exchange for providing confidential law enforcement information. |

| 19 | **SMITH** | 02/24/2010 | **SMITH** agreed to accept between $700 and $1,000 from Businessperson B, in exchange for providing an official letter. |
|----|-----------|------------|---|
| 20 | **SMITH** | 03/24/2010 | **SMITH** solicited $750 from Businessperson B in exchange for providing confidential law enforcement information. |
| 21 | **SMITH** | 04/29/2010 | **SMITH** solicited cash from Businessperson B in exchange for providing confidential law enforcement information. |
| 22 | **SMITH** | 05/04/2010 | **SMITH** discussed with Businessperson B the police badges he had obtained in exchange for $700. |

Each of the above is a violation of Title 18, United States Code, Sections 1952 and 2.

## FORFEITURE ALLEGATION

38) The allegations in Court One of this Indictment are incorporated herein.

39) Pursuant to Rule 32.2(a), Fed.R.Crim.P., the defendants **LEWIS** and **SMITH** are hereby notified that, upon conviction of the violation of Title 18, United States Code, Section 1962, as charged in this Indictment, the defendants shall forfeit, pursuant to Title 18, United States Code, Section 1963, all property constituting and derived from proceeds obtained, directly and indirectly, from racketeering activity in violation of Title 18, United States Code, Section 1962, including, but not limited to, at least $18,990, said amount being the total of the interests acquired and the gross proceeds obtained through the violation of Title 18, United States Code, Section 1962.

40) Defendants **LEWIS** and **SMITH** are jointly and severally liable for the aforementioned forfeiture amount.

41) Pursuant to Title 18, United States Code, Section 1963(m) and Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the Court shall order the substitution of property of the defendants up to the value of the property described in the previous paragraph if that property, as a result of any act or omission of the defendants:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third party;

    (c)    has been placed beyond the jurisdiction of the court;

    (d)    has been substantially diminished in value; or

    (e)    has been commingled with other property which cannot be divided without difficulty.

UNITED STATES OF AMERICA, by

**A TRUE BILL**

_____
DONALD J. CAZAYOUX, JR.
UNITED STATES ATTORNEY

_____
GRAND JURY FOREPERSON

_____
COREY R. AMUNDSON
ASSISTANT U.S. ATTORNEY

_____
DATE

9/1/10

# Criminal Cover Sheet      U.S. District Court

**Place of Offense:**

City    <u>Port Allen</u>

County/Parish <u>West Baton Rouge Parish</u>

**Matter to be sealed:**   ☒ No    ☐ Yes

**Related Case Information:**

Superseding Indictment __ Docket Number_____
Same Defendant _____     New Defendant _____
Magistrate Case Number  _____
Search Warrant Case No.  _____
R 20/ R 40 from District of _____
**Any Other Related Cases:** <u>10-100-BAJ-SCR & 10-99-RET-SCR</u>

**Defendant Information:**

Defendant Name     Derek A. Lewis

**U.S. Attorney Information:**

AUSA     Corey R. Amundson        Bar #   28865

**Interpreter:** ☒ No ☐ Yes     **List language and/or dialect:** _____

**Location Status:**
Arrest Date _____
_____     Already in Federal Custody as of     _____
_____     Already in State Custody
_____     On Pretrial Release

**U.S.C. Citations**

Total # of Counts:     14        ☐ Petty     ☐ Misdemeanor    ☒ Felony

| | **Index Key/Code** | **Description of Offense Charged** | **Count(s)** |
|---|---|---|---|
| set 1 | 18:1962(c) | Violating the racketeer and corrupt influenced organizations act | 1 |
| set 2 | 18:1341, 1346, & 2 | Mail fraud | 2 - 6 |
| set 3 | 18:1343, 1346, & 2 | Wire fraud | 7 - 8 |
| set 4 | 18:1952 & 2 | Use of an interstate facility in aid of racketeering | 11 - 16 |
| set 5 | 18:1963 | Forfeiture | |

**Date:** 08/31/2011     **Signature of AUSA:** _Corey R. Am_____

**District Court Case Number (To be filled in by deputy clerk):** _____

# Criminal Cover Sheet — U.S. District Court

**Place of Offense:**

City    <u>Port Allen</u>

County/Parish <u>West Baton Rouge Parish</u>

**Matter to be sealed:** ☒ No ☐ Yes

**Related Case Information:**

Superseding Indictment __ Docket Number_____

Same Defendant _____    New Defendant _____

Magistrate Case Number _____

Search Warrant Case No. _____

R 20/ R 40 from District of _____

**Any Other Related Cases:** <u>10-100-BAJ-SCR & 10-99-RET-SCR</u>

**Defendant Information:**

Defendant Name    Frederick W. Smith

**U.S. Attorney Information:**

AUSA    Corey R. Amundson      Bar #   28865

**Interpreter:** ☒ No ☐ Yes    **List language and/or dialect:** _____

**Location Status:**

Arrest Date _____

_____    Already in Federal Custody as of    _____

_____    Already in State Custody

_____    On Pretrial Release

**U.S.C. Citations**

**Total # of Counts:** _____11_____    ☐ Petty    ☐ Misdemeanor    ☒ Felony

| | Index Key/Code | Description of Offense Charged | Count(s) |
|---|---|---|---|
| set 1 | 18:1962(c) | Violating the racketeer and corrupt influenced organizations act | 1 |
| set 2 | 18:1343, 1346, & 2 | Wire fraud | 7 - 9 |
| set 3 | 18:1341, 1346, & 2 | Mail fraud | 10 |
| set 4 | 18:1952 & 2 | Use of an interstate facility in aid of racketeering | 17 - 22 |
| set 5 | 18:1963 | Forfeiture | |

**Date:** 08/31/2010    **Signature of AUSA:** _____

**District Court Case Number (To be filled in by deputy clerk):** _____